EXHIBIT 1

TO

VERIFIED COMPLAINT *IN REM*

DECLARATION OF CHRISTOPHER S. BURRELL

# DECLARATION OF CHRISTOPHER S. BURRELL

I, Christopher S. Burrell, provide the following information under the penalty of perjury, as provided by 28 U.S.C. § 1746, and declare that the following is true and correct to the best of my knowledge, information and belief.

**A.     Declarant's Background**

1.      I am a Task Force Officer with the United States Drug Enforcement Administration ("DEA") assigned to Nashville, Tennessee. I have been a Task Force Officer ("TFO") with DEA since May 2019, assigned to the DEA Task Force at the Nashville International Airport. I am currently employed by the Tennessee Highway Patrol and have been since January 2012. The federal crimes I am assigned to investigate include but are not limited to violations of 21 U.S.C. §§ 841 and 846 (drug trafficking) and 18 U.S.C. §§ 1956 & 1957 (money laundering).

**B.     Items Sought for Forfeiture**

2.      Pursuant to 21 U.S.C. § 881(a)(6), the United States seeks the forfeiture of $56,490 United States currency ("Defendant Property") because it is monies or a thing of value furnished or intended to be furnished by any person in exchange for a controlled substance or it is proceeds traceable to such an exchange, or monies used or intended to be used to facilitate drug trafficking in violation of 21 U.S.C. § 801 *et seq.*, including 21 U.S.C. §§ 841 and 846.

**C.     Basis of Information**

3.      The information in this Declarant was obtained through my personal observations, training and experience, information gathered during interviews of and conversations with civilians and other law enforcement officers, and written reports and investigations conducted by other law enforcement officers. I have not included every item of information known to me

concerning the Defendant Property and the facts surrounding this Declaration, but only those relevant to a determination that the Defendant Property is subject to forfeiture.

**D.     Facts**

4.      On March 9, 2022, the Nashville District Office Task Force Group 2, Airport Interdiction Group, received information from a Confidential Source ("CS"), regarding the suspicious travel itinerary of Jon Darnel Mickens ("Mickens") and Monteze Lamont Brown ("Brown").

5.      The information showed that Mickens and Brown were traveling one way from Nashville, Tennessee ("BNA") to Los Angeles, California ("LAX") via Southwest Airlines. Based upon my training and experience, Los Angeles is a known source city for narcotics. Drug traffickers, couriers and money mules, will often travel to source cities with cash to make drug purchases. These individuals will often book one-way flights and delay booking lodging or return flights until they reach their initial destination, intending to make it harder for law enforcement to track their movements.

6.      A criminal history check of Mickens was obtained through the National Crime Information Center ("NCIC") and revealed the following narcotics related arrests: March 13, 2006, Drug Trafficking (SCH 1) (FELONY); February 18, 2007, Drug Trafficking (FELONY); January 17, 2008, Drug Trafficking (Meth); January 30, 2001, Possession of Marijuana (misd.); and other Non-Drug Related Felony Charges.

7.      A criminal history check of Brown was obtained through NCIC and revealed no history, but Brown was wanted for questioning by Metropolitan Nashville Police Department ("MNPD") regarding a homicide investigation.

8. At approximately 07:20 PM, Detective Sargent Brad Kessler ("Sgt. Kessler"), Metro Nashville Airport Authority Detective Chris Lueders ("MNAA Det. Lueders") and I located two checked pieces of luggage belonging to Mickens and Brown.

9. Sgt. Kessler introduced his narcotics trained K-9, "Havoc", to arrays of luggage from the Southwest flight, which included bags checked by Mickens and Brown. Havoc showed a positive alert for the odor of narcotics emanating from the bags belonging to Mickens and Brown.

10. TFO Jesse Pilote ("TFO Pilote") approached both Mickens and Brown, who were seated next to one another in the gate area.

### *Encounter with Mickens and Seizure of $82,943.00*

11. Mickens was in possession of a backpack. TFO Moore and SA Gonzalez approached Mickens and identified themselves as a law enforcement officers. TFO Moore informed Mickens that a K-9 alerted to the odor of narcotics from his checked bag. Mickens denied having any narcotics in his bag.

12. Mickens gave consent to search his checked bag. A search of Mickens' checked bag revealed a large amount of cash in two different black bags and a black binder notebook.

13. Mickens consented to the search of his backpack. TFO Moore found a large amount of cash in the front pocket of the bag. Mickens agreed to speak with investigators at the DEA's office within the airport. TFO Moore explained to Mickens that he was not under arrest or being detained, and he was free to leave at any time. Mickens stated that he understood.

14. Mickens stated that he was traveling with about $78,000. Mickens stated that he did not have a job, but he sold dogs. Mickens stated that his kennel was called 4PF Kennels in Georgia. Mickens stated that he was not the owner of the kennel on paper because he has too many

4

kids that he had to pay child support. Mickens stated that his nephew is the owner of the kennel. Mickens said he had forgotten the names of all the owners of 4PF.

15. Regarding his trip to Los Angeles, Mickens said he was planning to buy multiple dogs from various breeds, but he did not know the breeder was any specifics on the bloodline. Mickens did not have a phone number for the breeder.

16. Mickens declined consent to search his phone.

17. TFO Burrell placed the cash from Mickens bags in a controlled environment. Sgt. Kessler introduced his narcotics detection trained K-9 "Havoc" to the array of boxes, and Havoc indicated a positive alert for the odor of narcotics on the box containing the cash.

18. TFO Burrell then informed Mickens that the cash was going to be seized as suspected drug proceeds. Mickens was explained the seizure process and would have the opportunity to file a claim on the USC.

19. The cash seized from Mickens' bags totaled $82,943.00.

### *Encounter with Monteze Brown and Seizure of Defendant Property*

20. When investigators approached Brown, he indicated at first that he was not Monteze Brown. He then then stated that he had not understood TFO Pilote, and that he was, in fact, Monteze Brown.

21. Brown continued to act confused. TFO Pilote explained several times that a K-9 had alerted to Brown's bag and showed Brown a photograph of his bag with the bag tag attached. Brown stated that he understood and agreed to accompany TFO Pilote to speak with investigators.

22. TFO Pilote and TFO Tim Szymanski ("TFO Szymanski") identified themselves with their DEA credentials and advised Brown that he was not under arrest nor was he being detained.

23. In response to questioning, Brown denied carrying narcotics in his bag. TFO Pilote asked Brown if he used marijuana recently because Brown smelled strongly of it. Brown stated that he only uses "Delta-8" and that he did not have any narcotics on him.

24. Brown consented to the search of his checked bag. Brown's checked bag was locked and sealed with a substance like glue. Brown explained that the bag was sealed "because of theft."

25. TFO Pilote again advised Brown that he was not under arrest and was free to leave. Brown became agitated and stated that he understood and that TFO Pilote did not have to keep repeating it.

26. TFO Pilote asked Brown if there were any large amounts of currency in his possession and Brown stated that he did have money. Brown stated that he had approximately $15,000.00 U.S. currency in the checked bag.

27. During the search, investigators found a large amount of U.S. currency bound by rubber bands.

28. Brown was asked if he was carrying any more U.S. currency in the zipped-up folder he had in his hand. Brown stated that he was and handed the folder to TFO Pilote. The folder contained two bank envelopes containing a large amount of U.S. currency in $100 denomination bills.

29. Investigators discovered two bank receipts in the search. The first receipt was for a withdrawal of $4,800.00 U.S. currency from the Navy Federal Credit Union on March 9, 2022, with a leftover balance of $977.75. The second receipt was for a withdrawal of $7,000.00 U.S. currency from the Fortera Credit Union in Clarksville, TN on March 9, 2022, with a leftover balance of $269.56.

30. It was observed that Brown had two cell phones in his possession. Brown refused consent to search his phones.

31. Investigator's questioned Brown on the source of the U.S. currency in his possession. Brown appeared to become more nervous. Brown was sweating, his hands were shaking uncontrollably, and he burped and yawned constantly.

32. Brown used the Facetime feature on one of his phones to contact a woman, who he claimed was his mom. Brown sought help from the woman on the phone to answer questions.

33. Upon questioning, Brown stated that he believed that the total amount of currency in his possession was $25,000.00. Brown then stated that he had not counted the cash.

34. When asked where the money came from, Brown stated that he withdrew it from the bank, and he pointed at the two envelopes that contained the $100 denomination bills.

35. Brown stated that $20,000.00 came from the bank and that he made $30,000.00 over the previous year as a rapper.

36. Brown stated that his stage name was "Hotboiiz", and he has been signed with Bloc Star Records, Universal Music Group for 2 years. Brown explained that he gets paid in cash for features and that he does not receive payment from the labels. Brown, however, could not provide details concerning his payment arrangement or how many features he had completed.

37. Brown stated that he rubber-banded the cash in his possession. Based upon my training and experience, rubber banded cash in large quantities is inconsistent with cash being withdrawn from a bank. Cash withdrawn from a bank in large quantities usually is bound by bank bands.

38. When asked about his travel, Brown stated that he was traveling to Los Angeles, California to purchase dogs and make record deals. Brown stated that is why he booked his travel

one-way at that time and not round-trip. Brown stated that he was going to drive to Las Vegas, Nevada for "music."

39. TFO Pilote asked Brown where he was staying while in each city. Brown stated that he had not arranged for lodging at that time.

40. Brown continued to state that he was investing in dog breeding. Brown could not provide more details about his dog business, including any LLC or business name.

41. Brown then showed TFO Pilote an Instagram account of "@bagbusinessempire" that was based in Kentucky. The account featured some pictures of what appeared to be pitbulls and large amounts of rubber banded U.S. currency.

42. At that time, in Brown's presence, TFO Pilote placed the subject currency in an unmarked box in an array. Sgt. Kessler introduced his drug K-9 "Havoc" to the array of boxes as witnessed by Brown. Havoc showed a positive alert on a box that was then confirmed by TFO Pilote to be the box that contained the U.S. currency.

43. TFO Pilote removed the U.S. currency and placed it in a DEA evidence bag, as witnessed by Brown. TFO Pilote explained to Brown that the U.S. currency was being seized as suspected drug proceeds.

44. Brown refused to sign a receipt for the seized cash. Brown stated that he did not want to make his flight and asked to be walked to exit lane of security.

45. The Defendant Property was counted by Loomis, a cash distribution network, and totaled $56,490. Of this total, there were 1979 twenty-dollar bills, representing the majority of the cash.

46. Based upon my training and experience, the large amount of $20 bills is consistent with street sales of narcotics.

### E. Conclusion

47. Based on the foregoing, my experience and training, and the facts of this investigation, I believe the facts support a reasonable belief that the Defendant Property is monies furnished or intended to be furnished by any person in exchange for a controlled substance or proceeds traceable to such an exchange, or monies used or intended to be used to facilitate any violation of 21 U.S.C. § 801 *et seq.*, including 21 U.S.C. § 841 (illegal drug trafficking) and 21 U.S.C. § 846 (attempted drug trafficking).

48. The Defendant Property is therefore forfeitable to the United States pursuant to 21 U.S.C. § 881.

*Chris Burrell*

Task Force Officer, Christopher S. Burrell
Drug Enforcement Administration